# UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| TONI SIEGEL,<br><br>        Plaintiff,<br><br>   v.<br><br>EDMARK AUTO INC., an Idaho Corporation d/b/a Edmark Superstore, f/k/a Edmark GM Superstore,<br><br>        Defendant. | Case No. 1:09-cv-00443-CWD<br><br>**MEMORANDUM DECISION AND ORDER** |

## INTRODUCTION

The Court has before it the parties' motions for summary judgment filed on February 15, 2011. (Dkt. 25, 27.) The issue presented by both motions is whether Defendant Edmark Auto Inc. ("Edmark") is liable for damages under the Family Medical Leave Act for terminating Plaintiff Toni Siegel's ("Siegel") employment. Edmark filed its motion requesting summary judgment on the issue of liability and damages,[1] while

---

[1] Count Two of Siegel's Complaint alleges breach of the covenant of good faith and fair dealing. (Compl. at 4, Dkt. 1.) Siegel did not oppose dismissal of this claim in response to Defendant's Motion for Summary Judgment. (Response at 2, Dkt. 34.) Therefore, summary judgment will be granted to Edmark with respect to Count Two of Plaintiff's Complaint. The sole remaining claim for which the parties request summary judgment is Count One, for violation of the FMLA.

**MEMORANDUM DECISION AND ORDER - 1**

Plaintiff Toni Siegel ("Siegel") requested partial summary judgment on the issue of liability and entitlement to liquidated damages under the Family Medical Leave Act, excluding general damages.

The Court conducted a hearing on July 27, 2011. Upon careful consideration of the parties' written submissions, oral arguments, and the evidence in the record, the Court will partially grant and partially deny both parties' motions, as explained in detail below.

## FACTS[2]

Edmark employed Siegel as an Internet sales associate at its facility in Nampa, Idaho, beginning on April 16, 2007. (Siegel Depo. at 71, Dkt. 25-3; Nicholson Decl. Ex. G, Dkt. 29-7 at 30.) At the time Siegel was hired, she was not provided with a policy manual nor was she given one during the course of her employment. (Siegel Depo. at 71, Dkt. 25-3.) Laurel Finch, who primarily handled payroll for Edmark, was responsible for providing new employees with employment paperwork. Finch testified that she does not recall providing Siegel with a copy of Edmark's employee handbook, and did not locate a signed acknowledgment of receipt of the handbook in Siegel's personnel file. (Finch Depo. at 9, 17–18, Dkt. 25-6.)

During the first week of September 2008, Siegel learned her father, who was living in Florida, was diagnosed with cancer. (Siegel Depo. at 112–113, Dkt. 25-3.)[3] Siegel

---

[2] The Court finds the following facts to be undisputed.

[3] The specifics of Siegel's father's diagnosis are contained in the progress summary and discharge note, which is attached hereto as Addendum 1 and filed under seal.

decided to travel to Florida to facilitate a move of her father to Boise, but did not know what date she would be leaving because her father's oxygen needed to be ready for travel. (Siegel Depo. at 115.) On or about September 13, 2008, Siegel notified her supervisor, Gene Tilby ("Tilby"), she needed time off from work to travel to Florida and transport her father to Idaho so she could manage his care. (Siegel Depo. at 113–115.) Tilby recalls Siegel mentioned to him about one week prior to September 17, 2008, that her father was "very ill in Florida," and she needed time off from work to bring her father to Idaho. (Tilby Depo. at 41–44, Dkt. 25-5.) Siegel left work at noon on September 17, 2008. (Siegel Depo. at 114.)

On Thursday, September 18, 2008, Tilby e-mailed Laurel Finch that Siegel had left the day before at noon "to take care of some things for her ailing father" and would be returning to work on Monday, September 22, 2008. (Tilby Depo. at 45, Ex. 5, Dkt. 25-5.) Tilby indicated that, any time an employee took time away from work, he notified Laurel Finch because Finch handled payroll. (Tilby Depo. at 45, Dkt. 25-5.) Tilby did not inquire further of Siegel regarding her father's illness, nor did he provide Siegel any paperwork related to the FMLA. (Tilby Depo. at 43–44, 48–49, Dkt. 25-5.) Upon receiving Tilby's e-mail, Laurel Finch did not ask any follow-up questions of Tilby or Siegel and did not determine what illness Siegel's father suffered from, nor did she forward the e-mail to any other Edmark employee to discuss a need for Siegel to take leave under the FMLA. (Finch Depo. at 20–21, Dkt 25-6.)

**MEMORANDUM DECISION AND ORDER - 3**

Siegel returned to work on Monday, September 22, 2008. (Siegel Depo. at 115–116.) On that same date, Tilby and Siegel agreed that Siegel would work additional hours to make up for the hours she had missed the previous week, and agreed to a written schedule that Siegel signed on September 22, 2008. (Siegel Depo. at 116, Dkt. 25-3; Ex. 1, Dkt. 25-3; Tilby Depo. at 47–48, 53–56, Dkt. 25-5.) However, on the afternoon of September 22, 2008, Siegel's father was admitted to a Boise hospital emergency room and later to its intensive care unit. (Siegel Depo. at 116, 121–126, Dkt. 25-3.) Siegel left work when she received the news. (Siegel Depo. at 121, Dkt. 25-3.)

Siegel later informed Tilby of her absence, and on either Tuesday, September 23, or Wednesday, September 24, 2008, she informed Tilby that, rather than making up her prior absences, she would agree to have her pay reduced. (Siegel Depo. at 116–120.)

While her father was in the hospital, Siegel spent every day at the hospital with her father talking with his physicians, drafting his will and testament, power of attorney, and other documents to manage his care, and providing emotional support to her father because he was "scared." (Siegel Depo. at 122–23.) On Thursday, October 2, 2008, Siegel was scheduled to work at Edmark, and she attempted to call Tilby to let him know she was still at the hospital with her father. (Siegel Depo. at 129.) Siegel was unable to reach Tilby, so she called her husband, Jeff Siegel, and asked him to try to reach Tilby to let him know she would be absent both October 2 and 3. (Siegel Depo. at 130.) Siegel's husband spoke to Tilby's secretary on the afternoon of October 2, 2008, and after being

informed Tilby was not in his office, asked to speak with another supervisor, John

Chalfant ("Chalfant"). (Jeff Siegel Depo. at 6, Dkt. 24-5.) Jeff Siegel spoke to Chalfant

and explained that Siegel was with her father at the hospital and would be absent from

work on Friday and Saturday, October 3 and 4, 2008. (Jeff Siegel Depo. at 5–6, Dkt. 25-

4.)

Tilby confirmed in deposition testimony that he did not have any communications

with either Siegel or her husband on October 2, 2008, about Siegel's absence. (Tilby

Depo. at 65–66, Dkt. 25-5.) Instead, Tilby learned from a co-worker on either October 2

or 3, 2008, that Siegel had called when she was in the emergency room with her father.

(Tilby Depo. at 67–68, Dkt. 25-5.) Tilby does not recall speaking with Chalfant, who was

Tilby's boss, about Siegel's absences on either of these dates. (Tilby Depo. at 69–72, Dkt.

25-5.)

Siegel's father was discharged from the Boise hospital during the late afternoon of

Friday, October 3, 2008. (Siegel Depo. at 120, 127.) Because her father required 24-hour

care, Siegel made arrangements at a nursing home and on the afternoon of October 3,

2008, Siegel assisted her father with his move from the hospital to the nursing home.

(Siegel Depo. at 127–28.) Siegel attempted to call Tilby on October 3, 2008, to let him

know she would not be at work, and when she was unable to speak to him she spoke to a

fellow employee, Carolyn, and gave Carolyn an update as to what was happening with

Siegel's father. (Siegel Depo. at 131.) Siegel spent Saturday, October 4 and Sunday,

October 5, 2008, with her father getting him settled and reassuring him that she would not leave him at the nursing home alone. (Siegel Depo. at 128.)

Siegel returned to work on Monday, October 6, 2008. (Siegel Depo. at 128.) However, she arrived late to work because she did not wake to her alarm. (Siegel Depo. at 129.) Siegel attempted that morning to call Tilby, but was unable to speak to him until she had already arrived to the parking lot at Edmark. (Siegel Depo. at 129, 134–35.) Tilby documented that Siegel called at approximately 8:21 a.m. and arrived at 8:45 a.m. (Tilby Depo. Ex. 7, Dkt. 25-5.) Later that afternoon, Siegel met with Tilby and Chalfant, and during that meeting, Edmark terminated Siegel's employment. (Siegel Depo. at 136.)

Prior to the meeting on the afternoon of October 6, 2008, and after Siegel had returned from Florida, Tilby met with Chalfant to discuss Tilby's "frustrations with [Siegel] not contacting — or staying in contact with me and letting me know where she was at and why she wasn't showing up for her shift." (Tilby Depo. at 73–75; *See also* Tilby Depo. at 90–91, Dkt. 25-5.) During the week prior to October 6, 2008, Tilby had no intention of terminating Siegel's employment. (Tilby Depo. at 98, Dkt. 25-5.) In response to Siegel's claim for unemployment benefits, Tilby represented to the Department of Labor that Siegel's employment was terminated because she called in late on October 6, 2008, after three days absence with "no notification or not proper notification." (Tilby Depo. at 102–103, Ex. 8, Dkt. 25-5.) Tilby explained that the proper procedure would have been for Siegel to notify Tilby directly about her absences, or leave him a message

on his voice mail. (Tilby Depo. at 103–104, Ex. 10, Dkt. 25-5.)

Tilby and Chalfant drafted a document reflecting the events of the termination meeting that occurred with Siegel on the afternoon of October 6, 2008, which indicated that she was discharged from employment due to "irreconcilable differences that could not be overcome," and also because of "frustration about the lack of communication when she was gone. Did not let us know what was happening." (Tilby Depo. Ex. 9, Dkt. 25-5.)

Tilby did not have much understanding of the Family Medical Leave Act, and did not have any discussions with Laurel Finch, whom he regarded as having knowledge about the FMLA, concerning whether Edmark should provide Siegel paperwork related to the Act. (Tilby Depo. at 48–49, Dkt. 25-5.) Tilby indicated that, because he did not understand all of the rules of FMLA, he would not have discussed those issues with Siegel and he "would have just referred any of that back to Laurel." (Tilby Depo. at 50, Dkt. 25-5.) Laurel Finch, however, testified that Carol Squibb, another Edmark employee, handled requests for leave, including FMLA paperwork, but that there was no document that an employee could reference that would indicate Carol was the person to contact for FMLA leave. (Finch Depo. at 19, Dkt. 25-6.)

Edmark admitted that Carol Squibb ("Squibb") did not provide Siegel with any paperwork related to the FMLA during either September or October of 2008, nor did Squibb inquire or obtain information from Siegel about the health condition of Siegel's father or Siegel's need to care for him. (Nicholson Decl. Ex. A, Dkt. 29-1.) Siegel

testified she was never requested to provide medical certification with respect to her father's condition, or provided paperwork to complete related to the FMLA. (Siegel Depo. at 148–149, Dkt. 29-3.) Edmark did, however, have a general poster regarding the FMLA in the break room at its main dealership building. (Chalfant Depo. at 24, Dkt. 29-5; Finch Depo. at 28–29, Dkt. 29-6.)

After Siegel's employment was terminated, Siegel cared for her father until his death in December of 2008. (Aff. of Def.'s Counsel Ex. 6, Dkt. 25-8.) Siegel began dental assistant school in April of 2009, and completed her certification in January of 2010. (*Id.*) Siegel did not look for work until she graduated from the dental assistant program. (Def.'s Statement of Facts ¶ 7; Aff. of Def.'s Counsel Ex. 6.) Siegel was unable to find a position in the dental assistant field. (Aff. of Def.'s Counsel Ex. 7, Dkt. 25-9.)

Siegel's earning capacity was evaluated by two experts. Plaintiff's expert, Nancy Collins, explained that Siegel's employment was terminated during a significant recession. (Aff. of Def.'s Counsel Ex. 8, Dkt. 25-10.) In Collins's opinion, as a result of the economy and high unemployment, it was "not probable she would have been able to replace [her] wage after termination. Even with additional training, she will likely not earn at the $40,000 wage range for a number of years." (Aff. of Def.'s Counsel Ex. 8, Dkt. 25-10.) On the other hand, Defendant's expert Douglas Crum was of the opinion that Siegel's failure to perform a job search that included her best set of skills and experience, which was in sales, was "unreasonable from a vocational rehabilitative standpoint. By not

pursuing job openings in that milieu, she has not demonstrated that she could not restore the earning capacity that she had at Edmark Auto, Inc." (Decl. of Crum, Dkt. 26.) Mr. Crum identified job openings for automotive sales representatives during the period Siegel was unemployed, although none were internet sales positions. (Decl. of Crum, Dkt. 26; Decl. of Nicholson, Ex. A, Crum Depo. at 38–41, 50–53, Dkt. 36-1.)

## DISPOSITION

### 1. Summary Judgment Standards

Motions for summary judgment are governed by Rule 56 of the Federal Rules of Civil Procedure. Rule 56 provides, in pertinent part, that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. The court should state on the record the reasons for granting or denying the motion." Fed. R. Civ. P. 56(a).[4] "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).

---

[4] Federal Rule of Civil Procedure 56 was revised effective December 1, 2010.

The party moving for summary judgment has the initial burden of showing that there are no genuine issues of material fact and that it is entitled to judgment as a matter of law. *See Anderson v. Liberty Lobby*, 477 U.S. 242, 247-48 (1986). Once the moving party has met this initial burden, the nonmoving party has the burden of presenting evidence to show that a genuine issue of fact remains. The party opposing the motion for summary judgment may not rest upon the mere allegations or denials of her pleading, but must set forth specific facts showing that there is a genuine issue for trial. *Id.* at 248. If the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial" then summary judgment is proper as "there can be no 'genuine issue of material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).[5]

Moreover, under Rule 56, it is clear that an issue, in order to preclude entry of summary judgment, must be both "material" and "genuine." An issue is "material" if it

---

[5] *See also*, Rule 56(e) which provides:

(e)     Failing to Properly Support or Address a Fact. If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may:
(1)     give an opportunity to properly support or address the fact;
(2)     consider the fact undisputed for purposes of the motion;
(3)     grant summary judgment if the motion and supporting materials--including the facts considered undisputed--show that the movant is entitled to it; or
(4)     issue any other appropriate order.

affects the outcome of the litigation. Before it may be considered "genuine," an issue must be established by "sufficient evidence supporting the claimed factual dispute . . . to require a jury or judge to resolve the parties' differing versions of the truth at trial." *Hahn v. Sargent*, 523 F.3d 461, 464 (1st Cir. 1975) (quoting *First Nat'l Bank v. Cities Serv. Co. Inc.*, 391 U.S. 253, 289 (1968)). The Ninth Circuit cases are in accord. *See, e.g., British Motor Car Distrib. v. San Francisco Automotive Indus. Welfare Fund*, 883 F.2d 371 (9th Cir. 1989).

To withstand a motion for summary judgment, a party (1) must make a showing sufficient to establish a genuine issue of fact with respect to any element for which it bears the burden of proof; (2) must show that there is an issue that may reasonably be resolved in favor of either party; and (3) must come forward with more persuasive evidence than would otherwise be necessary when the factual context makes the non-moving party's claim implausible. *Id.* at 374 (citation omitted). When applying the above standard, the Court must view all of the evidence in the light most favorable to the non-moving party. *Anderson*, 477 U.S. at 255; *Hughes v. United States*, 953 F.2d 531, 541 (9th Cir. 1992).

In the instant case, the parties have filed cross-motions for summary judgment on the issue of liability under the Family Medical Leave Act. "The filing of cross-motions for summary judgment, both parties asserting that there are no uncontested issues of material fact, does not vitiate the court's responsibility to determine whether disputed

issues of material fact are present." *Fair Housing Council of Riverside County, Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001). The Court has an obligation to independently review each cross-motion and its supporting evidence to determine if a genuine issue of material fact is in dispute. *Fair Housing Council*, 249 F.3d at 1137.

**2. Purpose of The FMLA**

Congress enacted the FMLA in response to growing concerns about inadequate job security for employees who have serious health conditions that prevent them from working for temporary periods of time. *Scamihorn v. General Truck Drivers*, 282 F.3d 1078, 1082 (9th Cir.2002). It is an expressed purpose of the statute to "entitle employees to take reasonable leave for medical reasons . . . in a manner that accommodates the legitimate interests of employers." 29 U.S.C. § 2601(b)(2)-(3) (2008);[6] *see also Bachelder v. Am. West Airlines, Inc.*, 259 F.3d 1112, 1120 (9th Cir.2001)(describing the purpose of the FMLA to "balance the demands of the workplace with the needs of employees to take leave for eligible medical conditions"). The FMLA does not replace traditional employer-established sick and personal leave policies; rather, it provides leave for uncommon and often stressful events such as caring for a family member with a serious health condition. *See, e.g., Scamihorn*, 282 F.3d at 1082.

---

[6] Title 29 Part 26 of the United States Code was amended effective October 28, 2009. Pub.L. 111-84, Div. A, Title V, § 565(a)(1)(A), (2), (3), Oct. 28, 2009, 123 Stat. 2309, 2310. Although the amendments generally relate to provisions of the FMLA applicable to service members in the armed forces and other military departments, the Court refers throughout its memorandum to the regulatory provisions in effect as of October 2008.

To effect this purpose, the FMLA guarantees an "eligible employee" twelve work weeks of leave each year "[b]ecause of a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D). The FMLA further provides that the taking of such leave "shall not result in the loss of any employment benefit accrued prior to the date on which the leave commenced." *Id.* § 2614(a)(2). An employee may sue to recover damages or equitable relief when her employer "interfere[s] with, restrain[s], or den[ies] the exercise or attempt to exercise" the rights guaranteed by the statute. *Id.* §§ 2615(a)(1), 2617(a)(2).

The FMLA places affirmative obligations on employers to notify employees of their rights and obligations under the Act, 29 U.S.C. § 2619; provide up to twelve weeks of unpaid leave to employees who qualify and provide sufficient notice to their employers, 29 U.S.C. § 2612; refrain from disciplining employees for taking leave covered by FMLA, 29 U.S.C. § 2615; reinstate employees to the same or equivalent job after their leave, 29 U.S.C. § 2614(a); and continue the employees' health care benefits during their absence. 29 U.S.C. § 2614(c).

Additionally, the right to FMLA leave includes the right to absences on an intermittent basis. 29 U.S.C. § 2612(b)(1); 29 C.F.R. § 825.203.[7] Employees may take

---

[7] Title 29, Part 825 of the Code of Federal Regulations implementing the FMLA was revised on November 17, 2008, with the revisions taking effect on January 16, 2009. Considering the revisions became effective after Siegel's employment was terminated, the regulations applicable are those that were in effect at the time her employment was terminated in October of 2008. *See Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988) ("[T]he APA, as a

leave in any size increments and employers may account for the leave in the shortest period of time the payroll system uses to calculate absences. 29 C.F.R. § 825.203(d).

Count One of Siegel's Complaint alleges violation of the FMLA. Accordingly, the motions for summary judgment require an analysis of whether Siegel was entitled to leave on the dates in question. Siegel must show that she was an eligible employee; that her father had a serious heath condition which required her care; and that she properly notified Edmark of her need for leave.

### A. *Siegel Was An Eligible Employee*

29 U.S.C. § 2611 defines an "eligible employee" as an employee who has worked for the employer for at least 1,250 hours during the 12-month period immediately preceding the start of the leave, has worked for the employer for at least twelve months, and the company at which the employee works employs fifty or more people within seventy-five miles of the employee's job site. 29 U.S.C. § 2611(2), (4).

There is no dispute that Siegel worked for Edmark since April 16, 2007, and had worked for Edmark for at least 1,250 hours during the twelve month period preceding September 17, 2008. (Nicholson Decl. Ex. A, Dkt. 29-1). Edmark admitted that it was a

---

general matter, forbids retroactive rulemaking . . . ."); *Scamihorn v. General Truck Drivers*, 282 F.3d 1078, 1083 (9th Cir. 2002) ("regulations cannot be applied retroactively . . . .") In making its determinations, the Court will rely on the Code of Federal Regulations in effect at the time of Siegel's termination from employment, considering substantive agency regulations have the force of law if authorized by Congress and promulgated to implement a statute. *See, e.g., United States v. Walter Dunlap & Sons, Inc.*, 800 F.2d 1232, 1238 (3rd Cir. 1986).

covered employer that employed at least fifty employees at or within seventy-five miles of the worksite at which Siegel worked. (Compl. ¶ 15, 16; Ans. ¶ 2, Dkt. 1, 4). Therefore, the Court finds Siegel was an "eligible employee" under the FMLA.

**B.** *Serious Health Condition Requiring Care*

Siegel must show not only that her father was suffering from a serious health condition, but also that her father's condition required care. 29 U.S.C. § 2612(a)(1)(C) (an employee is entitled to leave to "care for" a parent if the parent has a "serious health condition"). Each component will be addressed in turn.

(1) *Serious Health Condition*

A "serious health condition" entitling an employee to FMLA leave means an illness, injury, impairment, or physical or mental condition that involves inpatient care in a hospital, hospice, or residential medical care facility; continuing treatment by a health care provider; or a period of incapacity. *See* 29 C.F.R. § 825.114. A serious health condition includes also a "period of incapacity which is permanent or long-term due to a condition for which treatment may not be effective," such as during the terminal stages of a disease. Cancer is specifically mentioned in the regulations as a disease that would constitute a serious health condition, provided the individual was receiving treatment for the disease. *See* 29 C.F.R. § 825.114.

In its response brief, Edmark acknowledged that, based upon the information Siegel provided with her motion for summary judgment, Siegel's father "appears to have

suffered a serious health condition for at least part of the time in question in September and October of 2008." (Def.'s Mem. in Opp. at 3, Dkt. 33.) However, according to the medical evidence submitted, there can be no dispute that Siegel's father was diagnosed with end stage cancer, and was suffering from a host of other chronic conditions in their terminal stages. *See* note 3, *supra*. In addition, the regulations specifically mention cancer as an example of a "serious health condition."

Accordingly, despite its protestations that Siegel's father was "apparently" suffering for only "part of the time," Edmark has not made a factual showing sufficient to establish a genuine issue of material fact concerning Siegel's father's serious health condition. Siegel has carried her burden on the issue of "serious health condition."

(2) ***The Meaning of "Care"***

Next, Edmark disputes that Siegel provided "care" for her father during the entirety of Siegel's time away from work. Caring for an ill family member is described as a situation where:

> for example, because of a serious health condition, the family member is unable to care for his or her own basic medical, hygienic, or nutritional needs or safety, or is unable to transport himself or herself to the doctor, etc. The term also includes providing psychological comfort and reassurance which would be beneficial to a child, spouse or parent with a serious health condition who is receiving inpatient or home care.
> (b) The term also includes situations where the employee may be needed to fill in for others who are caring for the family member, or to make arrangements for changes in care, such as transfer to a nursing home.
> (c) An employee's intermittent leave or a reduced leave schedule necessary to care for a family member includes not only a situation where the family

member's condition itself is intermittent, but also where the employee is only needed intermittently--such as where other care is normally available, or care responsibilities are shared with another member of the family or a third party.

Edmark disputes that Siegel was "caring for" her father during three distinct periods Siegel was absent from work. The first period of absence occurred between September 17, 2008 through September 21, 2008, when Siegel traveled to Florida and returned with her father to Boise. The second period of absence occurred the afternoon of September 22, 2008, through October 4, 2008, while Siegel was at the hospital and later moved her father to a residential care facility. Siegel was scheduled to work on various dates after September 22, and also on October 2, 3, and 4, 2008. The final absence, according to Edmark, was Siegel's failure to report to work on time on October 6, 2008. Edmark contends that, for at least a portion of the three periods, Siegel was not "caring for" her father.

First, Edmark disputes that Siegel's trip to move her father from Florida to Boise constituted "care" because she was simply assisting her father's move. Edmark cites *Tellis v. Alaska Airlines, Inc.*, 414 F.3d 1045 (9th Cir. 2005) and *Marchisheck v. San Mateo County*, 199 F.3d 1068 (9th Cir. 1999) in support of its argument. *Tellis* held an employee's cross-country trip to retrieve the family vehicle during his wife's late-stage pregnancy difficulties did not constitute "care" for which the employee was entitled to leave under the FMLA. *Tellis*, 414 F.3d at 1048. *Marchisheck* involved an employee who

moved her son to the Philippines to keep him safe from further beatings. In that case, the plaintiff argued the period of time during which she moved her son constituted a period of care. The court held that it did not, because the plaintiff was not moving the child "so that he could receive superior—or any—medical or psychological treatment." *Marchisheck*, 199 F.3d at 1076.

Neither *Marchisheck* nor *Tellis* is availing. In this case, Siegel traveled to Florida because she was unable to manage her father's medical care from a distance, and she believed her father needed to be in Boise "so [she] could manage the care as to what was gong on." (Siegel Depo. at 114.) It is apparent that Siegel's father could not move himself, because he required oxygen, which required that it be "ready for the airplane." (Siegel Depo. at 115.) In addition, at the time Siegel picked her father up in Florida, he was an inpatient in a Florida hospital. (Siegel Depo. at 150–153, Dkt. 39–3.) And, Siegel traveled to be <u>with</u> her father specifically for the purpose of moving him from the hospital in Florida so that he could receive care in Boise, in contrast to the facts in both *Marchisheck* and *Tellis*.

Siegel traveled to Florida to move her father precisely so she could transport him to Boise to receive treatment and manage his care. *See Scamihorn v. General Truck Drivers*, 282 F.3d 1078, 1088 (9th Cir. 2002) (holding that son's move to be with his father and provide assistance with chores and emotional support constituted "care"). The regulations defining "care" clearly encompass "transport" "to the doctor," situations

involving arrangements for changes in care, such as "transfer to a nursing home," or care "at home." In this case, the facts are undisputed that the purpose and the destination of the travel was to transport Siegel's father specifically for medical reasons, so that Siegel could "take care of him." (Siegel Depo. at 112–113.) Accordingly, there is no disputed issue of material fact that Siegel provided care for her father, within the meaning of the FMLA, between September 17, 2008 and September 21, 2008, and Siegel's absences during this period are covered under the FMLA.

Edmark next disputes that Siegel provided care for the entirety of the period between September 22 through October 4, 2008, contending that Siegel's father was stable enough to be discharged from the hospital on October 1, 2008, and therefore did not require "care" after October 1, 2008. However, the facts are undisputed that on October 2, 2008, Siegel needed to arrange 24-hour care for her father upon discharge, did not have those arrangements ready, and made those arrangements throughout the day on October 2, 2008 after being informed her father was going to be discharged. (Siegel Depo. at 126–27.) On October 3, 2008, Siegel's father was discharged to a nursing home, and Siegel accompanied her father from the hospital to the care facility that evening. (Siegel Depo. at 126–27); *see also* note 3, *supra.* During October 3, and through the night of October 4, 2008, Siegel stayed with her father at the nursing home "because he was scared," and she helped him settle into his routine, in addition to providing him reassurance. (Siegel Depo. at 128.) Siegel did not return to her house until Sunday,

October 5, 2008. (Siegel Depo. at 128.)

The regulations clearly contemplate that making "arrangements for changes in care, such as transfer to a nursing home," constitutes care, as well as providing "psychological comfort and reassurance" to a parent receiving "inpatient or home care." Accordingly, the Court finds that Edmark's arguments are without legal basis [8] and it did not present evidence establishing any remaining disputed factual issues. For the entirety of the period from September 22, 2008, through October 4, 2008,the Court finds Siegel was needed to and did provide "care" to her father within the meaning of the FMLA, and Siegel's absences during this period also are covered under the FMLA.

As for Siegel's tardy arrival to work on the morning of October 6, 2008, there is no evidence in the record that Siegel was absent because she was providing care to her father that morning. Siegel was at home, and awoke late because she did not hear her alarm. (Siegel Depo. at 129, 134.) Siegel settled her father into the care facility the previous day. Therefore, there is no genuine dispute that Siegel was not caring for her father the morning of October 6, 2008, and the period of time Siegel was tardy is not a covered absence under the FMLA.

### C. *Employee's Notice Requirements*

Employees who wish to take leave covered by the FMLA must provide notice to

---

[8] Edmark's arguments to the contrary are not well taken, considering the regulations explicitly mention that care constitutes making "arrangements for changes in care, such as transfer to a nursing home." 29 C.F.R. § 825.116(b).

their employers when the leave is foreseeable. Specifically, the employee must provide the employer with "not less than 30 days' notice, before the date the leave is to begin, of the employee's intention to take leave . . . , except that if the date of the treatment requires leave to begin in less than 30 days, the employee shall provide such notice as is practicable." 29 U.S.C. § 2612(e)(2)(B).

It appears the parties agree that, for the absences in question, the leave was unforeseeable. Edmark does not challenge the notice Siegel gave for taking time to move her father to Boise from Florida between September 17, 2008 and September 21, 2008. (Def.'s Mem. in Opp. at 4–5, Dkt. 33.) Edmark also does not challenge the sufficiency of notice Siegel provided for the period between September 22, 2008 and October 1, 2008, while Siegel's father was an inpatient in the Boise hospital. (Def.'s Mem. in Opp. at 5, Dkt. 33.) Siegel apparently had agreed to make up time and work shifts on September 23, 24, and 26. (Tilby Depo. Ex. 6, 7 Dkt. 25-5.) But Edmark does not dispute that, at the time, Tilby knew Siegel was caring for her father and that she was in the hospital with him on the days she was not at work. (Def. Statement of Undisputed Facts ¶ 4, Dkt. 25-11; Tilby Depo. at 112, Dkt. 25-5.)[9]

---

[9] Tilby indicated that he knew Siegel had to take additional time off on September 23, 24, and 26 to take care of "things with her father," and he had knowledge that she was in the "ER because of her father's condition." (Tilby Depo. at 111, Dkt. 25-5.) It appears from Siegel's time card that she worked on September 25 and 29, and on October 1, 2008, but did not work on September 23, 24, 26, 27, 28, and 30. (Siegel Depo. Ex. 3, Dkt. 25-3.) On the days Siegel did not work during this period, her timecard indicates she was "absent" only on September 27 and 28. (*Id.*) The other days simply indicate "0" for the "day's total." (*Id.*)

Edmark does, however, challenge the sufficiency of the notice Siegel provided between October 2 through October 4, 2008, during which time Siegel was scheduled to work on October 2, 3, and 4.[10] Edmark argues that Siegel did not follow Edmark's "usual and customary notice and procedural requirements for requesting leave," which required her to contact Tilby directly and leave a voice mail message if Tilby did not answer his telephone. (Tilby Depo. at 80, Dkt. 25-5.) Additionally, Edmark contends that Siegel did not explain why she needed to be absent during those days, and Tilby had no reason to believe that Siegel was still in the emergency room or hospital caring for her father.

Edmark's statement of undisputed facts sets forth that Siegel unsuccessfully attempted to reach Tilby on October 2, and asked her husband to do so for her. (Def. Statement of Facts ¶ 5, Dkt. 25-11.) Edmark does not dispute that on October 3, 2008, Siegel talked to a co-worker about her absence and that Tilby heard about it, but contends that Siegel did not contact or attempt to contact Tilby on October 3 or 4. (*Id.*; Tilby Depo. at 67–70, Dkt. 25-5). Siegel testified that she tried twice to speak with Tilby on October 2; on October 3, she spoke to a co-worker, Carolyn, giving her an update as to what was happening; and did not call anyone at Edmark on October 4. (Siegel Depo. at 129–132.) Jeff Siegel testified that, on October 2, he talked to John Chalfant, Tilby's supervisor, and informed him of his wife's absence and that she was caring for her father. (J. Siegel

---

[10] Siegel's time card for those dates indicates she was "absent." (Siegel Depo. Ex. 3, Dkt. 25-3.)

Depo. at 5–7.)

There are two aspects to notice under the FMLA—timing and content. Concerning unforeseen absences, the notice must be given "as soon as practicable." 29 C.F.R. § 825.302(a).[11] But the FMLA does not specify a particular time limit concerning when the notice must be given. The regulations provide that, "[w]hether the leave is to be continuous or is to be taken intermittently or on a reduced schedule basis, notice need only be given one time, but the employee shall advise the employer as soon as practicable if dates of scheduled leave change or are extended, or were initially unknown." *Id.*

The regulations define "as soon as practicable" as meaning "as soon as both possible and practical, taking into account all of the facts and circumstances in the individual case. For foreseeable leave where it is not possible to give as much as 30 days notice, 'as soon as practicable' ordinarily would mean at least verbal notification to the employer within one or two business days of when the need for leave becomes known to the employee." 29 C.F.R. § 825.302(b). However, in extraordinary circumstances when such notice is not feasible, such as a medical emergency requiring leave because the employee must care for a family member with a serious health condition, written advance notice may not be required. 29 C.F.R. § 825.303(a). Notice may be given either in person,

---

[11] Edmark suggests the leave on October 2, 3, and 4 was foreseeable because Siegel knew she needed to make arrangements for nursing home care for her father. However, the FMLA clearly indicates leave is "foreseeable" when 30 days advance notice may be given. 29 C.F.R. § 825.302(a). In all other cases when 30 days advance notice is not possible because of a medical emergency, notice must be given "as soon as practicable." *Id.*

**MEMORANDUM DECISION AND ORDER - 23**

by telephone, facsimile, or by the employee's spokesperson if the employee is unable to do so personally. 29 C.F.R. § 825.303(b). The burden is on the employer to obtain additional information through "informal means" and the employee or spokesperson "will be expected to provide more information when it can readily be accomplished as a practical matter, taking into consideration the exigencies of the situation." *Id.*

As for content, the employee is required to provide "at least verbal notice sufficient to make the employer aware that the employee needs FMLA-qualifying leave, and the anticipated timing and duration of the leave." 29 C.F.R. § 825.302(c). However, the burden is on the employer to "obtain the necessary details of the leave to be taken." *Id.* The question is generally whether the information "imparted to the employer is sufficient to reasonably apprise it of the employee's request to take time off for a serious health condition." *Satterfield v. Wal-Mart Stores, Inc.*, 135 F.3d 973, 977 (5th Cir. 1998).

Edmark argues that Siegel failed to follow its absence notification policy because she did not call Tilby, her direct supervisor, fifteen minutes before the start of her shift and leave him a voice mail message when he was not available. While an employer may require compliance with policy concerning usual and customary notice procedures, the "failure to follow such internal employer procedures will not permit an employer to disallow or delay an employee's taking FMLA leave if the employee gives timely verbal or other notice." 29 C.F.R. § 825.302(d). Edmark's reliance, therefore, upon it's notification policy does not foreclose consideration of the notice Siegel actually gave, as

she must comply with the FMLA, not necessarily with Edmark's policy.

Generally, the sufficiency of both the notice's content and timing depends upon the facts and circumstances of each individual case, and the determination is better left to the jury. *Hopson v. Quitman County Hosp. and Nursing Home, Inc.*, 126 F.3d 634, 640 (5th Cir. 1997). Even if there is undisputed evidence, "rational triers of fact could nevertheless differ" on whether the notice was adequate in terms of its content and timing. *Satterfield*, 135 F.3d at 977.

In the instant case, the Court cannot determine, as a matter of law, that Siegel's notice to Edmark was adequate under the circumstances. Granted, Siegel was experiencing a medical emergency requiring her presence at the hospital with her father. But it appears Siegel worked intermittently up to October 2, when her father was scheduled to be discharged from the Boise hospital. On October 2, Siegel spent time making arrangements to transfer her father from the hospital to a nursing home. Siegel could have left Tibly a message that morning, but did not do so. Instead, her husband called Edmark sometime that afternoon and spoke to Chalfant about his wife's absence. Jeff Siegel claims he informed Chalfant that Siegel would be absent for the next two days and that there was no conversation between the two of them about Siegel needing to call in on either October 3 or 4. (Jeff Siegel Depo. at 6–7.) However, it is disputed what Chalfant knew about Siegel's father and his health condition, because Chalfant does not recall the conversation with Jeff Siegel. (Chalfant Depo. at 47, Dkt. 25-7.)

On the other hand, Tilby knew that, prior to October 2, Siegel was caring for her father in the hospital, but claims he had no reason to believe Siegel continued to do so after October 2. Yet Tilby testified also that, on October 2 or 3, he learned from another employee that Siegel was still at the hospital with her father. Despite being so informed, it is unclear what information Siegel imparted to Carolyn, her co-worker, on October 3, and what Tilby gleaned from talking with Siegel's co-workers. The record also does not reveal when Siegel called Edmark on October 3. However, there are the circumstances of a medical emergency, which the jury could find influenced Siegel's decision making with regard to notice.

Despite some knowledge as to Siegel's whereabouts, it is undisputed that no employee of Edmark inquired further of Siegel even though Tilby, as well as other co-workers, knew Siegel's father had been admitted to the hospital on September 22, 2008, and remained there up through October 2, 2008. Under the circumstances, a jury could find that "as soon as practicable" meant Edmark should have provided an opportunity for Siegel to explain her absences upon her return to work on October 6, 2008, as Siegel argued. Siegel was not, however, given any opportunity on October 6 to explain her absence from work on October 2, 3, or 4, despite Tilby's knowledge that Siegel had been with her father due to his illness and hospitalization.

Accordingly, the Court cannot determine as a matter of law whether Siegel's notice to Edmark was reasonable. There are disputed issues of material fact best left for

the jury on the issue of notice, both its content and timing, for the period between October 2 through October 4, 2008.

### D. *Interference With Siegel's Rights Under The FMLA*

The next issue presented by the parties is whether Edmark interfered with or restrained the exercise of Siegel's rights under the FMLA. Specifically, the FMLA "prohibits interference with an employee's rights under the law, and . . . [a]n employer is prohibited from interfering with, restraining, or denying the exercise of (or attempts to exercise) any rights provided by the Act." 29 C.F.R. § 825.220(a)(1). "Any violations of the Act or of [the] regulations constitute interfering with, restraining, or denying the exercise of rights provided by the Act. "Interfering with" the exercise of an employee's rights [includes], for example, . . . refusing to authorize FMLA leave . . . ." 29 C.F.R. § 825.220(b). Importantly, "employers cannot use the taking of FMLA leave as a negative factor in employment actions, such as hiring, promotions or disciplinary actions. . . ." 29 C.F.R. § 825.220(c).

In the instant case, Siegel contends that Edmark interfered with her rights under the FMLA because her taking of FMLA protected leave constituted a negative factor in Edmark's decision to terminate her employment. Siegel argues that she provided sufficient notice, Tilby had no intention of terminating her employment prior to her absences, and Edmark failed to meet its obligations under the FMLA, therefore chilling the exercise of Siegel's rights under the Act. Edmark counters that Siegel's employment

was terminated not because she was absent during her father's hospitalization, but because she was late for work on October 6, 2008, and because of her discordant relationship with Tilby, her supervisor. In addition, Edmark contends Siegel's notice was insufficient to put it on notice that Siegel was requesting leave that could be covered under the FMLA. Finally, Edmark asserts that it is irrelevant whether it conducted a further investigation, because it referred Siegel to the human resources department and Siegel did not follow up with either Finch or Squibb, and the consequences of failing to investigate further are only that the employer cannot credit the leave taken against the 12-week maximum.

### (1) *Negative Factor in Employment Action*

The regulations plainly prohibit the use of FMLA-protected leave as a negative factor in an employment decision. *Bachelder v. Am. W. Airlines, Inc.*, 259 F.3d 1112, 1125 (9th Cir. 2001). *See also Xin Liu v. Amway Corp.*, 347 F.3d 1125, 1136 (9th Cir. 2003) (following *Bachelder*.) The Court has determined that Siegel's intermittent absences from September 17, 2008, through October 4, 2008, constituted qualifying leave under the FMLA. Therefore, to prevail on her interference claim, Siegel need only prove by a preponderance of the evidence that her taking of FMLA-protected leave "constituted a negative factor in the decision to terminate" her employment. *Bachelder*, 259, F.3d at 1125. When the matter involves an interference claim under the FMLA, there is no scheme shifting the burden of production as there is in a Title VII case. *Id. See also*

*Sanders v. City of Newport*, No. 08-35996, 2011 WL 905998 *5 (9th Cir. 2011).

In this case, there is direct evidence of Edmark's motives for terminating Siegel's employment. The documentation concerning Siegel's termination created by Tilby on October 6, 2008, does not indicate that Edmark terminated Siegel's employment because she arrived late for work that morning, but because there were "irreconcilable differences" and because of frustration about the lack of communication when she was gone. Siegel was absent prior to October 6 because she was caring for her father, and all periods of absence were FMLA covered absences as discussed above.[12]

During the hearing on the motions, Edmark argued that Chalfant, not Tilby, hand wrote the statement about the frustrations due to lack of communication to the October 6th letter, and because Chalfant was not Siegel's supervisor, the statement should be ignored as a reason for the termination. However, such an argument overlooks the evidence in the record that Chalfant worked for Edmark; Chalfant was Tilby's supervisor; Jeff Siegel testified he notified Chalfant of his wife's absence on October 2, 2008; and, Chalfant participated in the meeting to terminate Siegel's employment with Edmark. In addition, Tilby discussed with Chalfant Tilby's frustrations with Siegel's lack of

---

[12] Edmark argued that Siegel's absences prior to October 2, 2008, were not relevant because it freely granted her leave. However, the Court finds to the contrary. Siegel's absences are relevant because she was absent for one specific purpose, to care for her father, and her absences on October 2, 3, and 4, were the culmination of a series of absences taken for that purpose. Therefore, the entire period of Siegel's absences is relevant to place the absences on October 2, 3, and 4 in context, and also for considering what Tilby knew and when he knew it, given the reason for Siegel's absences never changed.

**MEMORANDUM DECISION AND ORDER - 29**

communication prior to the October 6th termination meeting. Finally, Edmark did not present evidence that Tilby disagreed with the statement about Edmark's "frustration" with Siegel's lack of communication "when she was gone" in the October 6 termination document. (*See* Tilby Depo. at 99, Dkt. 25-5.)[13]

A second document Tilby created on October 6, 2008, recorded all of the time Siegel missed work due to "family issues with her father," and Tilby noted he had "several discussions" about Siegel working Thursday, October 2 and Saturday, October 4. (Tilby Depo. Ex. 7, Dkt. 25-5.) But Tilby knew Siegel was absent because she was caring for her father and because she had to arrange accommodations for him. (Tilby Depo. at 64, Dkt. 25-5.) Tilby knew also that, as of October 3, Siegel had been at the hospital caring for her father. (Tilby Depo. at 67–70, Dkt. 25-5.) Nevertheless, when Siegel did not arrive for work on either October 2, 3, or 4, Tilby expressed his frustrations to Chalfant about her attendance and communication. (Tilby Depo. at 90–91.) And prior to October 6, 2008, Tilby confirmed he "didn't have any intention of terminating [Siegel's] employment." (Tilby Depo. at 98.)[14]

---

[13] Tilby testified that he drafted the October 6th termination document, took it to Chalfant, and Chalfant added the additional information about frustration over the lack of communication. Tilby stated he "felt like it was a good idea to have it documented."

[14] Tilby was asked, "But it is fair to say then, that prior to her absences — during the week prior [to October 6, 2008], you didn't have any intention of terminating her employment?" to which Tilby responded, "No, not at all." (Tilby Depo. at 98.) Edmark makes much of the fact that Tilby had long standing issues with Siegel's performance. However, a jury could certainly infer that Tilby's statement that he had no intention of firing Siegel during the week prior to October 6 meant that whatever performance issues had existed were water under the bridge.

According to the record before the Court, Siegel's late arrival for work did not become an express reason for her termination until the Department of Labor interviews, which occurred on October 22, 2008. (Tilby Depo. Ex. 8, Dkt. 25-5.) In the record of the interview, Tilby is represented as stating the reason for Siegel's termination was "her calling in late on 10/6 after three days' absences with no notification or not proper notification." But Tilby also is represented as stating that he knew Siegel was making up time due to her father's illness.

Here, Siegel has presented evidence from which a jury could reasonably conclude Tilby considered Siegel's FMLA qualifying absences when he decided on October 6, 2008, to terminate Siegel's employment. *See Xin Liu*, 347 F.3d at 1136. Tilby's testimony that he had no intention of terminating Siegel's employment during the week prior to October 6, 2008, is particularly telling. The termination document written at the time of Siegel's termination does not mention Siegel's late arrival to work on October 6, 2008, at all. While it mentions "irreconcilable differences,"[15] such reference is too vague and may simply be a "convenient pretext" to support Edmark's decision to terminate Siegel's employment. *See Xin Liu*, 347 F.3d at 1137 (noting that performance evaluations regarding subjective criteria offer a "convenient pretext" for giving force to prejudice, and can support an strong inference of discrimination) (citing *Lujan v. Walters*, 813 F.2d

---

[15] There is evidence in the record that Tilby had difficulties interacting with Siegel, which he documented on January 8, 2008. (Tilby Depo. Ex 2, Dkt. 25-5.)

1051, 1057 (10th Cir. 1987)). Finally, the proximity in time between the leave taken and Siegel's termination of employment provides supporting evidence of a connection between the two events. *Xin Liu*, 347 F.3d at 1137.

On the other hand, Edmark contends Siegel's notice for the period between October 2 through 4 was inadequate. And as discussed above, there are disputed issues of material fact concerning Siegel's provision of notice to Edmark during the period after Siegel's father was discharged from the hospital between October 2 and 4, 2008. Further, there is evidence in the record that Tilby did have difficulties interacting with Siegel. (*See* note 15, supra.) It is not for the Court to weigh the evidence presented on summary judgment or judge the credibility of witnesses. *Neely v. St. Paul Fire & Marine Ins. Co.*, 584 F.2d 341, 344 (9th Cir. 1978). Therefore, such facts preclude the granting of summary judgment to Siegel on this issue.

### (2) *Interference Because Edmark Did Not Fulfill its Duties*

The Court's inquiry continues with Siegel's claim that Edmark interfered with her rights because it failed to fulfill its duties under the FMLA. Once an employee notifies her employer of the need for leave that might be covered under the FMLA, it is the employer's responsibility, not the employee's responsibility, to determine whether a leave request is likely to be covered by the Act. *Bachelder*, 259 F.3d at 1130. It is also the employer's responsibility to inquire as to specific facts to make that determination, and to inform the employee of her entitlements. *Xin Liu*, 347 F.3d at 1134.

29 C.F.R. § 825.301 sets forth the requirements of the written notice that must be provided to the employee when she requests leave. 29 C.F.R. § 825.301(b)(1) requires the employer to provide the employee with written notice detailing the specific expectations and obligations of the employee to keep the employer informed, such as via periodic reports of the employee's status, and also of the employer's obligations upon the employee's return to work, such as job reinstatement. Written notice must be provided to the employee "no less often than the first time in each six-month period that an employee gives notice of the need for FMLA leave . . . [or] within a reasonable time after notice of the need for leave is given by the employee—within one or two business days if feasible." 29 C.F.R. § 825.301(c) "If the employer fails to provide notice in accordance with the provisions of [Section 825.301], the employer may not take action against an employee for failure to comply with any provision required to be set forth in the notice." 29 C.F.R. § 825.301(f).

At the time of oral argument on the motions, Edmark asserted that it satisfied its duty to provide notice to Siegel because it had a poster discussing the FMLA in the break room. The parties do not dispute that Edmark posted a general FMLA poster in the break room accessed by all employees, and Siegel does not dispute that Edmark's "posting notice" obligation was met. (Pl.'s Reply at 6, Dkt. 42.) However, 29 C.F.R. §§ 825.300, § 825.301(b)(1), and § 825.301(c) require that, in addition to a posted notice explaining the FMLA's provisions and, if applicable, an employee handbook explaining obligations

under the FMLA, the employer also must provide the written notice outlined in the regulations. Accordingly, mere posting does not satisfy the employer's obligation to give additional written notice. Moreover, Edmark did not provide Siegel with an employee handbook, as no acknowledgment of receipt was found in her personnel file and there are no facts to suggest Siegel ever received a handbook. Edmark did not submit a copy of its handbook, other than two pages containing the general call-in policy, which is in the record before the Court. (See Nicholson Decl. Ex. G, Dkt. 29-7.) Although Edmark was required to meet the obligations of 29 C.F.R. § 825.301(b)(1) and (c), there is no evidence in the record that Edmark did so.

Edmark does not challenge the sufficiency of Siegel's notice during any time prior to October 2, 2008.[16] While there are disputed factual issues concerning whether Siegel adequately notified Edmark of the reasons for her leave during the period between October 2 and 4, 2008, there is no dispute that Edmark completely failed to initiate any procedure to determine whether Siegel qualified for FMLA leave at any time after her first FMLA-qualified absence on October 17, 2008.[17] Tilby contacted Laurel Finch,

---

[16] Edmark's acquiescence in Siegel's notice prior to October 1, 2008, raises another issue. It is not clear whether Siegel explicitly followed Edmark's purported notice policy prior to October 2, 2008, given she was in the hospital caring for her father. Edmark fails to mention what notice, if any, Siegel gave prior to her absence on September 22, 2008, or thereafter up until October 1, 2008. 29 C.F.R. § 825.304(a) permits an employer to waive an employee's FMLA notice obligations or the employer's own internal rules on leave notice requirements. However, neither party raised the issue of waiver.

whom he regarded as the person to contact when an employee was absent, but did not direct Siegel to speak to Finch about FMLA leave.[18] Nor did Tilby inquire of Siegel about her need or reasons for being absent. And Finch did not inquire further or provide information to Siegel about FMLA leave.

Laurel Finch testified that Carol Squibb was the person to discuss FMLA leave with Edmark's employees, but the undisputed evidence is that Squibb knew nothing about Siegel's leave and never provided any FMLA information to Siegel. The Court therefore finds that Tilby and the Human Resources Department failed to fulfill their duties to Siegel as required by the FMLA under 29 C.F.R. § 825.301. *Xin Liu*, 347 F.3d at 1135 (finding that where human resources department took no action to determine whether employee was entitled to FMLA leave, that employer failed to fulfill its duties as required by the FMLA).

By failing in its responsibility to assess Siegel's entitlement to FMLA leave at any time between September 17 and October 4, or provide her with written information about her rights during that period, Edmark denied Siegel a substantive right under the FMLA.

_____

[18] Edmark grossly mischaracterizes Tilby's testimony, contending that Tilby "referred Plaintiff to Laurel Finch, the employer's bookkeeper as to her request for leave" and that Siegel spoke to Laurel Finch about her leave and whether there was anything to protect her from getting fired while taking care of her father. In fact, Tilby testified that he "would have" referred all FMLA related issues to Finch, not that he did in fact do so in this case. (Tilby Depo. at 48–50.) And Siegel spoke to Finch at some point during the period between September 22 and October 6 about whether there was anything to protect her from getting fired, but Siegel indicated Finch stated "no because you opted out of the insurance," with no indication Finch spoke to Siegel about the FMLA. (Siegel Depo. at 146, Dkt. 29-3.)

Such conduct constitutes a violation of the FMLA. *See* 29 C.F.R. § 825.220(b) ("Any violations of the Act or of these regulations constitute interfering with, restraining, or denying the exercise of rights provided by the Act.").

Edmark's argument that the only consequence for failing to conduct a further investigation is that it cannot count the mischaracterized FMLA-eligible leave against the 12-week maximum time is incorrect. While the failure to impart notice to employees is not akin to a strict liability offense, if the employee can show prejudice as a result of the violation, such as establishing that the employer's failure to advise rendered her unable to exercise her rights in a meaningful way, thereby causing injury, the employee may recover under the FMLA. *See Stewart v. Sears, Roebuck & Co.*, 2005 WL 545359 *11 (D. Or. Mar. 7, 2005) (explaining that for a plaintiff to succeed on an interference claim for the employer's failure to inform the employee of her FMLA rights and obligations, the plaintiff must show that the employer's alleged failure caused the plaintiff prejudice, rendering the plaintiff unable to exercise her FMLA rights in a meaningful way).

To succeed on a claim for interference based upon inadequate notice, a plaintiff "must show that the defendant's failure to inform resulted in the unknowing forfeiture of the protection of the FMLA. In other words a Plaintiff must show that s/he qualified for FMLA protection, or that his/her employer caused the ineligibility by failing to properly notify him or her of the FMLA's requirements and/or entitlements." *Mora v. Chem-Tronics, Inc.*, 16 F.Supp.2d 1192, 1227 (S.D. Cal. 1998).

Neither party addressed the issue of what, if any, causal connection a plaintiff must show between the employer's alleged inadequate notice and the resulting harm to the employee. Siegel has not addressed whether her lack of understanding and knowledge of her rights prevented her from complying with her notice obligations under the FMLA. Nor has she addressed whether Edmark's failure to provide FMLA information deprived her of the right to make an educated decision about her FMLA leave. Presumably, part of Siegel's claim is that the lack of information resulted in her termination from employment with Edmark, but she does not allege or argue that was the case. It seems entirely plausible that Edmark's failure to provide Siegel with information in turn caused Siegel to provide Edmark with inadequate notice. And a jury could find the requisite causal connection if it concludes that Edmark terminated Siegel's employment for failing to give adequate notice but failed to inform her what notice or other information was required under the FMLA.

Siegel argued that Edmark deprived her of the opportunity to provide an explanation on October 6th, but did not present evidence or argument that, had she been properly informed of her rights under the FMLA, she would have acted differently prior to October 6. Accordingly, the Court cannot conclude, as a matter of law, that Edmark's failure to provide the required written notice caused Siegel to forfeit FMLA protection. As a result, the Court declines to grant summary judgment to Siegel on her second claim of interference.

### 3. Damages

Both parties advance arguments concerning Siegel's claim for damages for violation of the FMLA. Edmark contends Siegel is not entitled to damages for front and back pay because she failed to mitigate her damages. Edmark's argument advances its affirmative defense to Siegel's claim for damages, asserting that all damages are precluded because Siegel failed to look for work until January 2010, and did so in a different field. Siegel, on the other hand, requests a determination that, in the event she is awarded damages, liquidated damages should be awarded as a matter of law because Edmark did not act in good faith. Both issues will be addressed in turn.

### A. *Mitigation*

Edmark argues that its affirmative defense for failure to mitigate damages precludes Siegel's damage claim for front and back pay. (*See* Ans. at 3, Dkt. 4.) Specifically, Edmark contends that Siegel should have been able to find employment within six to twelve months from her date of discharge in a retail job or automotive sales job similar to her past relevant work, but chose not to do so and instead went back to school to earn a degree in a lower paying field. There is no dispute that Siegel obtained training to become a dental hygienist. Siegel argues, however, that there were no equivalent positions available in the automotive sales industry after her employment was terminated, because the jobs available were floor sales jobs, not internet sales jobs. In addition, Siegel contends that she applied for several jobs, and after being unable to

secure one, she decided to obtain training to become a dental assistant. Furthermore, Siegel argues that her job search was affected by the recession and economic downturn experienced by all job seekers during 2008.

An employer who violates the FMLA is liable for damages equal to the amount of any lost wages, any actual monetary losses sustained as a result of the violation such as the cost of providing care, and interest on the amounts claimed. 29 U.S.C. § 2617(a)(1)(A). However, courts generally consider whether the employee mitigated her damages. *See, e.g., Sherman v. AI/FOCS, Inc.*, 113 F.Supp.2d 65, 75 (D. Mass. 2000). Whether or not an employee has met her duty to mitigate damages is a factual determination. *Booker v. Taylor Milk Co., Inc.*, 64 F.3d 860, 865 (3rd Cir. 1995) (discussing mitigation in the context of a Title VII claim).

For Edmark to satisfy its burden of proving failure to mitigate, Edmark must prove that, based upon "undisputed facts in the record, during the time in question there were substantially equivalent jobs available, which [the plaintiff] could have obtained, *and* that [the plaintiff] failed to use reasonable diligence in seeking one." *Odima v. Westin Tucson Hotel*, 53 F.3d 1484, 1497 (9th Cir. 1995). An employee's failure to look for work is not an exception to the general rule that the employer must present evidence as to the availability of comparable employment. *Odima*, 53 F.3d at 1497. But "the unemployed . . . need not go into another line of work, accept a demotion or take a demeaning position." *Ford Motor Co. v. EEOC*, 458 U.S. 219, 231 (1982).

There are disputed issues of material fact concerning whether any positions existed that were substantially similar to Siegel's previous work at Edmark. Edmark argues that its expert, Douglas Crum, "testified concerning three job openings that were posted with the Department of Labor" on the day Crum performed a job search. (Def.'s Reply at 9, Dkt. 43.) However, Crum performed the job search in November 2010 and February 2011. (Crum Depo. at 51, Dkt. 43-3.) Crum did not do any research concerning the availability of an Internet sales position similar to Siegel's position at Edmark for any time between January 2009 and November 2010. (*Id.* at 35, 51). Crum confirmed he had no information about openings for Internet sales positions prior to prior to August of 2010. (Crum Depo. at 52, Dkt. 43-3.) Crum did testify, however, that there would have been other sales positions available during the period involving face-to-face selling, or floor sales. (Crum Depo. at 48, 51–53, 56, Dkt. 43-3.)

Siegel disputes that a floor sales position is substantially similar to her Internet sales position at Edmark, which involved only phone solicitations and setting appointments with a floor salesman. Crum testified, however, that floor sales involved a similar skill set and additional skills were learned on the job. (Crum Depo. at 19 – 21, Dkt. 43-3.) Siegel's expert, Ms. Collins, was of the opinion that the economy and recession would have contributed to a lack of available jobs at the time Siegel would have been looking for alternative employment.

Although Siegel herself presented no evidence that she sought a job on or after

January of 2009,[19] Collins indicated that Siegel was "unable to find a job and qualified for a training program through WIA, the Workforce Investment System," and was provided funding to do so. (Aff. of Def.'s Counsel Ex. 8, Dkt. 25-10.) Edmark argues that Siegel's enrollment in school was unreasonable, but if there were no available jobs and Siegel's efforts simply proved unsuccessful, the jury may well find her efforts to be reasonable, especially in light of the economic conditions existing at the time Siegel looked for work. "[R]easonable effort is all that is required, not ultimate success," and an award of back pay should not be limited by an employee's enrollment in school. *Miller v. AT&T*, 83 F.Supp.2d 700, 708 (S.D.W.Va. 2000).

Based upon the differing opinions of the expert witnesses employed by both parties, Edmark has not carried its burden upon summary judgment. Edmark has not presented sufficient facts establishing that there were substantially equivalent jobs available during the relevant period that Siegel could have obtained. Further, the parties dispute whether Siegel's change to an alternative career was reasonable. Accordingly, the Court finds the question of mitigation of damages is best left to the jury at the time of trial.

**B.** *Liquidated Damages*

Siegel requests summary judgment on the issue of liquidated damages, arguing that

---

[19] Siegel's father passed away in December of 2008. Considering Siegel may have been entitled to 12 weeks of FMLA leave from and after September 17, 2008, she would likely have been able to return to work in January of 2009.

she is entitled to such damages because no reasonable grounds exist for Edmark's belief that the termination of Siegel's employment did not violate the FMLA. Siegel does not request any judgment concerning the amount of or entitlement to damages other than disputing Edmark's contention she failed to mitigate her damages. But Siegel argues Edmark's actions were not taken in good faith, because Tilby acted out of ignorance of the FMLA; no one at Edmark inquired whether Siegel's absences were FMLA qualifying; nor did anyone at Edmark provide Siegel with the required notices.

Edmark argues Siegel is not entitled to a ruling regarding liquidated damages because any such ruling would be premature in the absence of a determination Siegel is entitled to any damages at all. Second, Edmark contends that Siegel is not entitled to damages because she was not terminated from her employment in violation of the FMLA. And finally, Edmark contends it acted reasonably and in good faith because Defendant had an FMLA policy, Tilby was aware of the policy, and the policy was posted.

29 U.S.C. § 2617(a)(1)(A)(iii) mandates an additional award of liquidated damages equal to the sum of actual damages plus interest, unless the employer "proves to the satisfaction of the court that the act or omission which violated section 2615 of [the FMLA] was in good faith and that the employer had reasonable grounds for believing that the act or omission was not a violation of section 2615. . . ." Edmark therefore has the burden to prove good faith and reasonableness. The Court has discretion to "reduce the amount of the liability to the amount and interest determined," and can also order

equitable relief. 29 U.S.C. § 2617 (a)(1)(A)(iii), (a)(1)(B). But an employer who acts in good faith and without knowledge that its conduct violated the FMLA is still liable for actual damages regardless of its intent. *Bachelder*, 259 F.3d at 1130.

In this case, Edmark must show both good faith and reasonable grounds for its acts or omissions. Beyond posting the required statutory notice, which Siegel may or may not have seen, Edmark completely failed in its obligations to inform Siegel of her rights under the FMLA. Although there is no evidence in the record whether Edmark's employee handbook contained information about the FMLA, even assuming there was, there is no dispute that Siegel was not provided a copy of the handbook. Considering Siegel's absences during the entirety of the period between September 17 through October 4, 2008, were FMLA-qualifying, Edmark had an obligation to provide information to Siegel about FMLA leave within two business days of September 17, 2008. 29 C.F.R. § 825.301(c). It did not. Tilby knew nothing of Edmark's obligations under the FMLA, Finch provided Siegel with no information, and although Finch indicated Squibb was the designated employee to do so, Finch did not refer the matter to Squibb. *See, e.g., Cooper v. Fulton County, Ga.*, 458 F.3d 1282, 1287 (11th Cir. 2006) (Where employer neither consulted an attorney, read the statute or regulations, or reviewed any advisory opinions before terminating its employee's employment, the court found the employer had no reasonable basis for failing to comply with the FMLA).

Had Edmark given Siegel information about the FMLA, perhaps Siegel would

have handled the notices she gave to Edmark differently. At the hearing, Edmark represented that had Siegel given proper notice, she would have been granted leave for the period between October 2 through 4. Edmark's abrogation of its responsibilities may have caused it to be in the position it now complains of when one considers that, had Siegel been given information about her obligations under the FMLA, she might have provided notice that satisfied both FMLA regulations and Edmark's policy.

However, the Court agrees with Edmark that a final ruling on Siegel's motion for partial summary judgment on liquidated damages is premature because Edmark has not been found liable for actual damages under the FMLA. 29 U.S.C. § 2617(a)(1)(A)(iii) requires payment of liquidated damages only after a violation of the FMLA has been found, and actual damages are proven. *See, e.g., Smith v. Micron Electronics, Inc.*, No. CV-01-244-S-BLW, 2005 WL 5328543 *1 (D. Idaho Feb. 4, 2005) (finding plaintiff's motion for partial summary judgment on the issue of liquidated damages premature because liability had not been determined under the FLSA). Disputed issues of material fact remain on the issue of notice and causation, as discussed above. Nor has the Court considered whether Siegel has proven actual damages. Accordingly, the Court will deny Siegel's motion for partial summary judgment on liquidated damages without prejudice and defer its ruling to such time as the jury renders a verdict if this matter proceeds to trial.

## CONCLUSION

Based upon the discussion above, the Court concludes the following:

1) Siegel conceded summary judgment is proper on Count Two of her complaint alleging breach of the covenant of good faith and fair dealing. Edmark is therefore entitled to summary judgment on Count Two of Plaintiff's Complaint.

2) Siegel's intermittent leave taken between September 17, 2008, and October 4, 2008, qualified as FMLA-eligible leave. Plaintiff is entitled to summary judgment on this issue.

3) There are disputed issues of material fact concerning the content and timing of Siegel's notice to Edmark for the period of October 2 through October 4, 2008, during which time Siegel was scheduled to work. Summary judgment is therefore denied to both parties on this issue.

4) There are disputed issues of material fact concerning whether Edmark interfered with Siegel's rights under the FMLA by considering Siegel's FMLA leave as a negative factor in its decision to terminate her employment. Summary judgment is therefore denied to Siegel on this issue.

5) Siegel established as a matter of law that Edmark failed to fulfill its obligation to provide the requisite notice under the FMLA. However, Siegel did not make a showing on the issue of causation with respect to Siegel's claim of interference for Edmark's failure to provide notice of her FMLA rights. Summary judgment will therefore be denied

based upon the lack of proof of causation.

6) Disputed issues of material fact preclude a determination that Siegel failed to mitigate her damages. Summary judgment is therefore denied to Edmark on this issue.

7) Summary judgment on the issue of liquidated damages is premature, and summary judgment is denied to Siegel on this issue.

## ORDER

**NOW THEREFORE IT IS HEREBY ORDERED:**

1)      Plaintiff's Motion for Partial Summary Judgment (Dkt. 27) is **GRANTED IN PART AND DENIED IN PART** consistent with the Court's opinion expressed herein.

2)      Defendant's Motion for Summary Judgment (Dkt. 25) is **GRANTED IN PART AND DENIED IN PART** consistent with the Court's opinion expressed herein.



DATED: August 5, 2011

_____

Honorable Candy W. Dale
Chief United States Magistrate Judge